UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

JESUS SANCHEZ,                              :

                              Petitioner,   :           REPORT AND
                                            :           RECOMMENDATION
              - against -                   :
                                            :           04 Civ. 4363 (RMB) (RLE)
WILLIAM PHILLIPS, Superintendent,           :
Green Haven Correctional Facility,          :
                                            :
                              Respondent.   :
_____

To the HONORABLE RICHARD M. BERMAN, U.S.D.J.:

## I. INTRODUCTION

Petitioner, Jesus Sanchez ("Sanchez"), a New York state prisoner now incarcerated in

Fishkill Correctional Facility, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Sanchez was convicted of kidnapping in the second degree (N.Y. Penal Law § 135.20) and

criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03) on June 15,

2000.  Petition Under 28 U.S.C. § 2254 ("Pet.") ¶¶ 3, 5.  He was sentenced to concurrent

indeterminate terms of twelve and one-half to twenty-five years and seven and one-half to fifteen

years, respectively.  **Id**. ¶ 4.

Sanchez contends that his constitutional rights were violated when 1) the trial court, and

then the Appellate Division, rejected his claim based on **Batson v. Kentucky**, 476 U.S. 79

(1986), accepting the prosecutor's claim that she had excluded two black jurors because they

lived in the Soundview neighborhood in the Bronx where there had been recent protests against

the acquittal of the police officers involved in the shooting of Amadou Diallo; 2) a recording of a

911 call was admitted as a present sense impression; and 3) the prosecutor gave a summation that

included improper argument.  Pet. ¶ 13.  For the reasons set forth below, I recommend that the

petition be **GRANTED** as to the first claim, and **DENIED** as to the other two.

## II. BACKGROUND

**A.    Factual Background**

**1.    Voir Dire**

The first day of voir dire in Sanchez's case was February 24, 2000.  Transcript, February

24, 2000 (" 2/24 Tr.") at 16.  The voir dire of that first panel continued on February 28, 2000.

Trial Transcript ("Tr.") at 1.  Between these days, on February 25, 2000, a jury in Albany

acquitted four white New York City police officers who shot African immigrant Amadou Diallo

nineteen times as he stood unarmed outside his home in the Soundview area of the Bronx.  Jane

Fritsch, The Diallo Verdict: The Overview; Four Officers in Diallo Shooting are Acquitted of All

Charges, The New York Times, February 26, 2000, at A1. Upon returning to voir dire on

February 28, the prosecutor in Sanchez's case expressed her concern that the weekend's events

could have affected some jurors' ability to sit on the case, particularly since her office was the

focus of criticism during the protests.  Tr. at 4.  She did not mention any specific neighborhoods

or other criteria upon which her concern might be based, but instead spoke generally about the

entire jury.  ***See id***.  She emphasized that the coverage had been widespread, stating that the case

had been covered on "all the news stations" and "all the newspapers,"and that she was worried

about its effect on the potential jurors.  **Id**.  Defense counsel objected to specifically raising the

issue, arguing that unless there was some showing of prejudice by the panel, there was no need to

bring their attention to the issue and that to do so might be "to poison them."  **Id**. at 5.  The judge

agreed that it was important to consider if any of the jurors had heard anything that would cause

2

them to believe they could not be fair, but noted that the events should not affect Sanchez's case. **Id**. ("I think it's an appropriate matter for considering whether any of the prospective jurors have heard anything which would cause them to believe they couldn't be fair in this case.  There has been a great deal of displeasure with the jury verdict in Albany, albeit, obviously, that's a separate matter.  It should not reflect on this case . . .").  He stated that he had already asked general questions about the jury's views about the Bronx County District Attorney's Office, *see* 2/24 Tr. at 36, and he decided to re-state those questions and allow further questions if any of the jurors gave any indications that caused concern.  Tr. at 6.  The judge addressed the prosecutor's concerns and again asked the panel general questions about their feelings about the New York City Police Department, and the Bronx District Attorney's Office.  **Id**. at 32-33.  No jurors raised their hands in response to his inquiries.  **Id**.

After questioning the panel in a group, the attorneys for each side stated they had no challenges for cause and then began to lodge their peremptory challenges.  **Id**. at 145.  After the prosecutor had challenged five jurors, the defense raised a **Batson** challenge.  **Id**. at 146.  When asked to articulate the pattern of the alleged discrimination, **id**. at 146-47, the defense counsel explained that the prosecutor had challenged five of seven black jurors on the panel.  **Id**. at 147-48.  The judge asked the prosecutor to provide race-neutral reasons for each of the five challenges.  Defense counsel did not question her reasons for three of the five: (1) the partner of one had been convicted of possession of a weapon and the FBI had entered the juror's home to search for the gun while she was there, **id**. at 152-54; (2) the son of another had been convicted of a drug-related offense, **id**. at 157-58; and (3) the third had failed to maintain eye contact with the prosecutor during the voir dire.  **Id**. at 158-59.

3

With respect to the other two, Sprauve and Stubbs, the prosecutor explained that these two jurors were from the Soundview section of the Bronx.  **Id**. at 149, 154-55.  Speaking first of Sprauve, the prosecutor indicated that "there has been a tremendous amount of publicity . . . concerning Mr. Diallo," and that there had been "many protests" in the Soundview area. **Id**.at 149.  Defense counsel protested that this was too vague, and "based on a feeling rather than anything else" about the "population of Soundview."  **Id**.  The judge recognized that Sprauve had said she could be fair, and stated that he was "not indicating [he knew] what [her] personal opinions [we]re," but allowed the challenge anyway, stating that Sprauve had said she was from Soundview, and that there had been demonstrations in that area calling for the resignation of Robert Johnson, and demonstrating discontent with the New York City Police Department.  **Id**. at 149-50.  The judge said he found this to be a race-neutral reason to remove Sprauve from the jury.  **Id**. at 150.  He then pointed out that the Diallo trial had been removed from Bronx County because of the concern that a fair jury could not be selected from the Bronx.  **Id**.  The judge concluded by stating that he knew that demonstrations had taken place "throughout New York City, throughout the Bronx, [and] at the United Nations," and again noted the public criticism of the Bronx District Attorney's Office and the police department.  **Id**. at 151.

As for Stubbs, the prosecutor stated that because her notes indicated he also lived in the Soundview section, and his daughter worked for Soundview Cable, the same reasoning articulated for Sprauve applied to him as well.[1]  **Id**. at 154-55.  The defense objected that "there's

---

[1]As mentioned below, on appeal, Sanchez argued that the record indicates that Stubbs was not, in fact, from Soundview, providing further support for the argument that the prosecutor's challenge of Stubbs was pretextual.  The Appellate Division found this argument unpreserved because the defense did not object or attempt to correct the prosecutor as to her understanding of Stubbs's residence.  As both parties note, any argument based on Stubb not actually living in Soundview is thus procedurally barred.  ***See* Coleman v. Thompson**, 501 U.S. 722, 750 (1991);

no connection to this case and there's no basis in the record of these worries," and "there hasn't been anything established here that these People, just because of where they come from, can't be fair jurors." **Id**.  The judge repeated that he found the reason race-neutral.  **Id**. at 155.  The judge mentioned that the prosecutor had asked him to specifically inquire into the jurors' feelings about the District Attorney's Office, and that, although "she didn't come forward on that," he still thought the reason for striking the black jurors from Soundview was not pretextual and was race-neutral.  **Id**. at 156-57.

      2.       **The Trial**

     Sanchez was charged with using a gun to kidnap Leonor Cazares, a waitress at a restaurant on Third Avenue and 121st Street in Manhattan.  **Id**. at 1031.  According to Cazares's testimony at trial, on July 29, 1997, Sanchez ate lunch at the restaurant accompanied by another man known as "Chino," and told her he was going to take her away.  **Id**. at 496.  He and Chino left but returned at 5:00 p.m.  **Id**. at 497.  Sanchez pointed a gun at Cazares, and put her in a van. **Id**.  The men took Cazares to a second floor apartment, and Sanchez took her to a bathroom.  **Id**. at 498.  According to Cazares, Sanchez left, but later returned, and told her that if she didn't cooperate, he would let other men, whose voices she could hear, do anything they wanted to her. **Id**.  Sanchez then took Cazares out of the bathroom to another room, ordered her to take off her clothes, and raped her.  **Id**. at 498.  After the rape, Sanchez put his gun under the mattress, **id**. at 519, and told Cazares not to tell anyone or something would happen.  **Id**. at 503.  She put on her clothes and he put her in a taxi.  **Id**. at 503.  Cazares went back to the restaurant and reported what had happened to a police officer who was at the restaurant.  **Id**. at 504-05.  Sanchez's

---

**Jones v. Vacco**, 126 F.3d 408, 414 (2d Cir. 1997) (*citing* **Ellman v. Davis**, 42 F.3d 144, 147 (2d Cir. 1994)).

eventual co-defendant, Chino, had already returned to the restaurant and spoken with the officer. **Id**. at 601.  Cazares went with the officer to the apartment and identified Sanchez.  **Id**. at 505-06, 543-44.  A vaginal exam was conducted at the hospital.  **Id**. at 506.  A pair of torn underwear, which she identified as hers, was found by the police at the apartment.  **Id**. at 524-26.

Another waitress, Juanna Gonzaga, testified at trial that she had heard Cazares scream and had seen Sanchez take her away.  **Id**. at 592-97.  Gonzaga called 911, and a customer spoke to the operator.  **Id**. at 599-600.  The call was recorded at 6:32 p.m.  **Id**. at 579.  The tape was admitted at trial as a present sense impression.  **Id**. at 583-84.  Defense counsel argued that since Cazares had testified that the kidnapping took place around 5:00 p.m., the tape was not made contemporaneously, and could not be admitted.  **Id**. at 580.  The prosecutor argued that the kidnapping was an ongoing event that lasted until after Sanchez's co-defendant returned to the restaurant, **id**. at 581-82, and the court agreed.  **Id**. at 583-84.

The vaginal exam of Cazares and other physical evidence of the scene did not determine whether intercourse had taken place.  **Id**. at 783-84, 787-88, 827-32.  Doctors confirmed that she had a bruise on her right breast, and she testified that Sanchez had bitten her.  **Id**. at 502, 774-81, 816.  The defense, however, pointed out various inconsistencies between Cazares's testimony at trial and an affidavit she had signed in July 1997.  For example, she had stated in the affidavit that two other men were in the room and observed the rape, but denied this at trial.  **Id**. at 527-28. The defense also demonstrated inconsistencies between the witnesses' descriptions of the actions Sanchez took, the timing of the incidents, and the events of the investigation.  **Id**. at 902-17.

The defense objected to a number of statements the prosecutor made in her summation. First, the prosecutor stated that it was the defense counsel's "job" to argue that his client did not

do the crime.  **Id**. at 921-22.  The court sustained the objection to this statement and told the jury

to ignore it.  **Id**. at 922.  Also, in stating that Cazares and Gonzaga had identified Sanchez as the

perpetrator, the prosecutor began to say that Cirila Garcia, a witness who did not testify, had also

identified Sanchez.  **Id**. at 932.  The court sustained defense counsel's objection, and instructed

the jury to disregard the comment about Garcia.  **Id**.  The prosecutor also suggested that the

restaurant workers delayed calling the police because of their possible lack of immigration status.

**Id**. at 929.  Sanchez also objected that the prosecutor was "vouching" for one of her witnesses

when she referred to the "truth" of what the witness said.  **Id**. at 938.  Finally, in closing, the

prosecutor stated that it was through "the Grace of God" that the police were able to find the

location where Cazares was held.  **Id**. at 938.  The defense objected to this as an invocation of a

higher morality.  **Id**. at 944.  The court refused to give a curative instruction to the jury as to the

comment about God, stating that it would only "highlight the area."  **Id**.  When the jury returned

a verdict, Sanchez was acquitted of rape and sodomy in the first degree, but convicted of

kidnapping and criminal possession of a weapon in the second degree.  **Id**. at 1030-32.

**B.    Procedural Background**

The Appellate Division affirmed Sanchez's conviction on February 20, 2003.  **People v.**

**Sanchez**, 754 N.Y.S.2d 639 (App. Div. 1st Dep't 2003).  On appeal, Sanchez had raised the

same three claims included in the instant petition.  **Id**. at 640-41.  In rejecting his claims, the

court found that the prosecutor's assertion that she had challenged the two black jurors because

they were from Soundview was not pretextual, finding that her concern about the neighborhood

was "genuine" and "particularized" and "not based on race."  **Id**. at 640.  Sanchez had also

argued that the prosecutor was incorrect as to the residence of one of the black jurors, who did

7

not actually live in Soundview.  Affidavit in Opposition ("Opp. Aff."), Exh. 1, at 8.  The court

found this latter argument unpreserved, and stated that "the prosecutor's honestly held belief,

even if factually mistaken, provided a nonpretextual reason for challenging the panelist."

**Sanchez**, 754 N.Y.S.2d. at 640-41. The court then decided that while the trial court erred in

admitting the 911 call as a present sense impression, the error was harmless.  **Id**. at 641.  The

court also found Sanchez's argument that the 911 tape violated his right to confront witnesses

under the Sixth Amendment unpreserved, but that any error was harmless.  **Id**.  Finally, the court

found that the prosecutor's arguments did not deprive Sanchez of a fair trial, particularly because

of the trial court's curative instructions.  **Id**.  Leave to appeal to the New York Court of Appeals

was denied on May 16, 2003.  **People v. Sanchez**, 100 N.Y.2d 542 (2003).

### III. DISCUSSION

**A.      Threshold Issues**

**1.       Timeliness**

A petitioner must file an application for a writ of habeas corpus within one year of his

conviction becoming final.  A conviction becomes final "'when [the] time to seek direct review

in the United States Supreme Court by writ of certiorari expire[s],'" that is, ninety days after the

final determination by the state court.  **Williams v. Artuz**, 237 F.3d 147, 151 (2d Cir. 2001)

(*quoting* **Ross v. Artuz**, 150 F.3d 97, 98 (2d Cir. 1998)).  Sanchez's conviction became final on

August 14, 2003.  His petition was received in this Court's *Pro Se* Office on May 3, 2004, and is

therefore timely.

2.      **Exhaustion**

Generally, a federal court may not consider a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies.  *See* 28 U.S.C. § 2254(b)(1)(A).  The exhaustion doctrine requires a habeas petitioner challenging a state conviction on federal grounds to have presented his or her claims to the state courts first.  *See* **Daye v. Attorney Gen. of N. Y.**, 696 F.2d 186, 191 (2d Cir. 1982) (**en banc**), *cert. denied*, 464 U.S. 1048 (1984).  The claim must not only have been presented to the state courts, but the state courts must have had notice of the federal nature of the petitioner's claim.  **Id**. at 191.  A petitioner may give such notice by:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, [or] (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

**Id**. at 194.  All of Sanchez's claims were presented to the state courts on direct appeal.  The federal nature of his claims was asserted in sufficient terms to "call to mind" the protections of the United States Constitution.  **Id**.  Therefore, his claims have been exhausted.

B.      **Merits of Sanchez's Claims**

1.      **Standard of Review**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") constrains a federal habeas court's ability to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  The Act limits issuance of the writ to circumstances in which the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); *see* **Williams v. Taylor**, 529 U.S.

362, 412 (2000).  A state court decision is contrary to federal law if the state court "arrives at a

conclusion opposite to that reached by [the Supreme] Court on a question of law or if [it] decides

a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."

**Williams**, 529 U.S. at 413.  Furthermore, in cases where the state court decision rests on a

factual determination, the federal court must find that the "decision . . . was based on an

unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."  28 U.S.C. § 2254(d)(2).

> **2.**　　**Batson** Claim

Under **Batson**, a petitioner may claim that a prosecutor used peremptory challenges in

violation of the Equal Protection Clause.  476 U.S. at 96.  First, the petitioner must establish a

prima facie case that he was denied equal protection by demonstrating that a prosecutor exercised

his peremptory challenges to purposefully exclude members of a cognizable group from the jury,

and that there were relevant circumstances sufficient to raise an inference that the prosecutor

excluded jurors solely on the basis of race.  **Id.**  Second, if the petitioner has established a prima

facie case, the prosecution must offer a race-neutral basis for striking the jurors in question.  **Id**.

at 97-98.  Third, the court must determine whether the petitioner has shown purposeful

discrimination.  **Id**. at 98.  At this stage, the petitioner can refer to "all relevant circumstances,"

even those outside the case, to raise "the necessary inference of purposeful discrimination."  **Id**.

at 96-97.  In most cases, this requires the defendant to show that "the reasons the prosecution

gave are a pretext for purposeful discrimination."  **Majid v. Portuondo**, 428 F.3d 112, 126 (2d

Cir. 2005).

A state-court finding that a prosecutor's race-neutral reason for a peremptory challenge is not pretextual is the sort of factual determination which, under AEDPA, a federal court must find objectively unreasonable in light of all the evidence in the state court proceeding in order to overturn on habeas review. **Miller-El v. Cockrell**, 537 U.S. 322, 340 (2003) (*citing* 28 U.S.C. § 2254(d)(2)) [hereinafter "**Miller-El I**"]. In evaluating the merits of a **Batson** claim, the court must presume that the state court's factual determinations are correct, *see* 28 U.S.C. § 2254(d)(2), and the petitioner must present "clear and convincing evidence" to rebut this presumption, **Miller-El I**, 537 U.S. at 341. As the Supreme Court established in **Hernandez v. New York**, the reviewing court must afford significant deference to a state court's findings on the issue of discriminatory intent, since the finding "largely will turn on evaluation of credibility." 500 U.S. 352, 365 (1991) (*citing* **Batson**, 476 U.S. at 98 n.21). This standard is "demanding but not insatiable." **Miller-El v. Dretke**, 545 U.S. 231, 240 (2005) [hereinafter "**Miller-El II**"]. "Deference does not by definition preclude relief." **Miller-El I**, 537 U.S. at 340; *see* **Parsad v. Greiner**, 337 F.3d 175, 181 (2d Cir. 2003). In evaluating the persuasiveness of a prosecutor's reasons for his peremptory strikes, the court may measure credibility by factors such as: "the prosecutor's demeanor"; "how reasonable, or how improbable, the explanations are"; and "whether the proffered rationale has some basis in accepted trial strategy." **Miller-El I**, 537 U .S. at 338-39 (*citing* **Purkett v. Elem**, 514 U.S. 765, 768 (1995)).

Sanchez has met this standard. The trial court's determination that the prosecutor's reasons were not pretextual was objectively unreasonable in light of the entire state court

proceeding, as was the Appellate Division's decision upholding the trial court's ruling.

Because in the first panel of prospective jurors, the prosecutor challenged five out of seven black jurors, Tr. at 148, the initial threshold of a statistical pattern demonstrating discrimination is met. **Miller-El II**, 545 U.S. 240-41. The trial court recognized this in finding that the defense had made out a prima facie case. Tr. at 148. The record here is somewhat incomplete because the race of each juror is not noted apart from that initial panel. *See* Opp. Aff., Exh. 3. However, it appears two black jurors from that panel ultimately sat on the jury. *See* Tr. at 163. The Court does not have the benefit of any final statistics showing how many black jurors were considered and challenged by each party, but agrees with the trial court that the statistical pattern raised an inference of discrimination.

However, this Court disagrees with the trial court's decision to allow the juror challenges, in light of a number of circumstances the judge himself explicitly recognized, but ultimately disregarded. As the trial court stated, there was no connection between the Diallo verdict and Sanchez's case. The police played a non-controversial and limited role in Sanchez's case. There were no allegations of police brutality, excessive use of force, or any other misconduct. Police credibility was not an issue in the case. Similarly, and also recognized by the trial court, there was no nexus between the Diallo protests and any statements or experiences of the challenged jurors.

Respondent relies heavily on the fact that the prosecutor expressed concern that, as a result of the events in the days between the first and second days of voir dire, some of the jurors might have heard some publicity that would affect their ability to be fair. There are two

problems with this argument.  First, the prosecutor did not mention any specific concern about the community of Soundview.  Instead, when raising the fear of publicity, she specifically framed the issue as one that affected the entire jury pool.  The prosecutor presented the publicity as pervasive, appearing on all the television stations and in all the newspapers, and not specific to any particular group of jurors.  The prosecution requested that the judge make an inquiry of the entire panel as to whether the Diallo publicity would affect their ability to be impartial.  Second, the judge addressed this concern by asking general questions about the jurors' feelings about the District Attorney's Office and the police.  The judge agreed with defense counsel that asking about the Diallo verdict would be "going a little bit too far" and injecting "something that should not be an issue."  Tr. 5-6.  Instead, the judge decided to repeat the general questions asked on the previous day of voir dire, and the prosecution agreed this would be satisfactory.  After the judge asked the jurors where they lived, the prosecutor conducted her own questioning, but did not ask any questions relevant to her purported reason for the subsequent challenges.  She did not confirm that Stubbs and Sprauve lived in the Soundview area, nor did she inquire as to whether any other jurors worked or had relatives working in the Soundview area.  In fact, the prosecutor did not ask Sprauve a single question, and only asked Stubbs one question, which was successfully objected to, and did not request that the judge ask the two jurors any questions apart from the other members of the panel.  The prosecutor did address other members of the panel, some of them extensively, and asked them questions about their ability to be fair, as well as inquired further into some of the statements they had made on other topics.  Tr. at 106-24.  By not inquiring into jurors' connections to Soundview area, the prosecutor failed to make any record of any possible prejudice.  Even though the judge recognized this lack of a record, and

13

expressed the belief that the Diallo verdict should not even be an issue for the jury, he still found the reason provided by the prosecution to be racially neutral and allowed the challenge.  **Id**. at 156-57

      The prosecution's claims that jurors from Soundview presented a problem, apart from all other identifying characteristics, are disingenuous, particularly given the complete lack of any indication that Sprauve or Stubbs had said anything that would raise concern.  The prosecutor's actions are not consistent with a concern about jurors whose ability to be fair had been affected by the Diallo verdict and the ensuing protests.  First, if the prosecutor believed that jurors could not be impartial if they lived in the Soundview area, regardless of any affirmations to the contrary, the prosecutor would have noted that information carefully during voir dire.  Here, however, the prosecutor was mistaken about Stubbs being from Soundview: he actually said he lived in Northeast Bronx.  While an objection based on this error was not preserved at trial, the prosecutor's failure to pay close enough attention to the jurors' responses to the question of where they lived to accurately recount this information a few minutes later substantially undermines her claim of reliance.  Second, there is no evidence that the Bronx District Attorney's Office had any general concerns about the Soundview area, or had sought to exclude jurors from that section.  A policy directive that no one from the Soundview area could serve on a jury until the protests subsided would have been unprecedented, and there is no indication that this was the Office's policy at the time.  Third, if the prosecution's reasoning is credited as not pretextual, the prosecution should have challenged jurors from all neighborhoods in which protests took place. Even while permitting the challenge, the judge pointed out that the protests were not confined to the Soundview area, but instead were occurring "throughout New York City, throughout the

Bronx, at the United Nations."[2]   If the concern about the effect of the protests were not mere pretext, the prosecutor would have been expected to note other neighborhoods where protests were happening, and move to challenge jurors on that basis.

Juror competence depends on an assessment of individual qualifications and ability to impartially consider evidence at trial.  **Batson**, 476 U.S. at 87.  Looking at the voir dire in its entirety, there was no indication Sprauve and Stubbs would have been anything other than model jurors.  Sprauve had taken college courses and worked for the Department of Social Services as a case manager.  Tr. at 56.  She had two relatives in law enforcement and had served on three other juries in criminal cases.  **Id**. at 37, 44.  Stubbs was a high school graduate and worked as a nursing orderly for twenty-seven years.  **Id**. at 72.  Both potential jurors said they could be fair in the case, **id**. at 38, 73, and the prosecutor failed to explore any further.  This demonstrates inconsistency in the prosecutor's trial strategy, which undermines her credibility as to her reasons for the peremptory challenges of the "Soundview" jurors.  The fact that the trial court acknowledged that a challenge on this basis was unusual supports the determination that his decision to uphold the peremptory challenges is objectively unreasonable.  Tr. at 156.  The judge dealt adequately with the issue initially by asking general questions.  He recognized the underlying facts which demonstrated that the prosecutor's reasons were pretextual, explicitly stating that there was no connection to the case, no record of problems with these jurors, and that the protests had happened all over the city.  In the face of these circumstances, however, he

---

[2] The judge's statement is corroborated by newspaper accounts which reported that protests erupted in the Bronx, Manhattan, and Albany, as well as in New Jersey.  *See*, *e.g.*, id.; William K. Rashbaum, The Diallo Case: The Protests; Marchers Protest Diallo Verdict, Taunting Police Along the Way, The New York Times, February 27, 2000, at 11.

allowed the challenge anyway, finding the reason race-neutral despite clear evidence to the contrary.

The usual **Batson** case requires a link between the challenged juror and the characteristic causing concern, particularly in cases analyzing peremptory challenges based on a juror's community.  For example, in **People v. Guess**, 616 N.Y.S.2d 781, 782 (App. Div. 2d Dep't 1994), the state court affirmed the trial court's determination that the defense's challenge of a white male juror who resided in the same community where the crime at issue took place was not race-neutral.  Because the defense had failed to establish that the juror was familiar with the location, or that the fact that he resided there would affect his ability to be fair, the state court found the challenge based on community to be pretextual.  **Id**.  While the Second Circuit has upheld peremptory challenges based on the fact that the jurors' residence was the same as a defendant, the court has been clear that this was just one among various factors which raised questions about the jurors' ability to be fair in those cases.  In **Majid**, the potential juror lived in the same neighborhood as the defendant, and the prosecutor expressed concern that the juror might be familiar with, or fearful of, the defendant or his family.  428 F.3d at 116.  The prosecutor also cited, however, concerns about the juror's "willingness to convict on circumstantial evidence" and "pending vacation plans."  **Id**.  In addition, the prosecutor based his challenge on the juror's religious devotion, specifically that she might be more "forgiving," identify with defendant over their shared religion, or hold the prosecutor to a higher standard than reasonable doubt.  **Id**.  In contrast, the "Soundview" jurors were challenged solely on the basis of their residence.  They had no connection to the case, had made no statements raising questions about their ability to be fair, and there were no additional factors which caused the prosecutor any

16

concern.

In **Rodriguez v. Schriver**, 392 F.3d 505, 510-11 (2d Cir. 2004), the Second Circuit reviewed a **Batson** claim in a case in which a Latino juror was challenged by the prosecutor because, among other reasons, he came from the city of Santo Domingo.  Although the court found that **Batson** claim was procedurally barred because it was unpreserved, **id**. at 511, it addressed the merits of the claim.  The court indicated that invoking the city of Santo Domingo was not inherently discriminatory, or "code for Latino" as the petitioner had argued.  **Id**. at 510-11.  Instead, the court found that the prosecutor had determined that "it was the confluence of [the juror's] employment in combination with Santo Domingo that triggered his concern."  **Id**. at 511.  The defendant in the case was being tried for sale of a controlled substance.  **Id**. at 506. The prosecutor had questioned the juror about his job as a building superintendent in Washington Heights because, in his experience, some of the superintendents in that area were "passively involved with drug dealers" and that many of the drug dealers prosecuted from that neighborhood were from Santo Domingo.  **Id**. at 511.  In response to the prosecutor's questions, the juror had, in fact, indicated that he knew that tenants dealt drugs out of his building, although he testified this would not affect his ability to sit on the jury.  **Id**. at 508.  The court recognized that the prosecutor's inference about the juror, then, was not a discriminatory one, but that instead he was "concerned with indicia suggesting that [the juror] himself might have been involved in drug dealing, or potentially tolerant of it."  **Id**. at 511.

In **Rodriguez**, there was a connection between the indicia of concern (drug-dealers from Santo Domingo and building superintendents in Washington Heights tolerant of drug-dealing),

17

the challenged juror and the defendant's charge.  In contrast, the prosecutor in this case based the

challenge solely on neighborhood.  The New York Court of Appeals has determined that while

there is no *per se* rule that "the potential association of a juror's neighborhood generally with

members of one race or ethnicity is a race-related factor . . . . [t]hat kind of potential geographical

or neighborhood linkage may . . . be a factor ultimately to be weighed into the determination

whether a proffered reason is pretextual."  **People v. Payne**, 88 N.Y.2d 172, 187 n.2 (1996)

(remanding to the trial court for a determination of whether defense counsel's reasons for striking

a white juror, that she was from Bay Ridge and a high school teacher, were pretextual).

An additional aspect of the traditional **Batson** analysis is not easily discernible on the

record, which does not reflect whether there were any white jurors from Soundview on the panel.

A successful challenge, however does not depend upon finding "an exactly identical white juror."

**Miller El II**, 545 U.S. at 247 n.6.  While no parallel side-by-side analysis is possible here, a

close look at the entire jury selection process supports Sanchez's claim that the prosecutor's

reason for challenging the "Soundview" jurors was pretextual.

Important to the Court's analysis is the treatment of jurors who had given statements that

would actually raise some concern about their ability to be fair to the District Attorney's Office.

One juror had been accused of sodomy in another district, Tr. at 176-77, but remained on the

jury.  **Id**. at 260.  Another juror's sister was murdered in a crime never solved by the Manhattan

District Attorney's Office, **id**, at 402-05, but she was not challenged by the prosecution.  **Id**. at

468.  *See* **Miller El II**, 545 U.S. at 244-45 (noting unchallenged white jurors who were as

equivocal as challenged black jurors about the death penalty).  The prosecutor secured these

jurors' assurances they could be fair, but conducted no specific questioning on the issue of the

Soundview jurors' attitudes about the District Attorney's Office.  Her claim that they could be

biased, therefore, appears to be an after-the-fact justification, unsupported by any objective

responses.  The Court finds that Sanchez has provided clear and convincing evidence that the

prosecutor's reason for challenging the Soundview jurors was pretextual.  Furthermore, the Court

finds that the trial court's decision to allow the prosecutor's peremptory challenges, and the

Appellate Division's decision upholding those challenges, are objectively unreasonable in light

of the entire proceeding.  On that basis, Sanchez's petition for a writ of habeas corpus should be

**GRANTED**.

> ### 3.      **Admission of Recording of 911 Call**
>
> #### a.      **Evidentiary Claim**

Sanchez's second claim is that the trial court's admission of the 911 tape as a present

sense impression violated his constitutional rights.  The Appellate Division found that the tape's

admission as a present sense impression was error, but that the error was harmless.  **Sanchez**,

754 N.Y.S.2d at 641.  On habeas review, state court evidentiary decisions are evaluated solely on

principles of fundamental fairness.  "The introduction of improper evidence against a defendant

does not amount to a violation of due process unless the evidence is so extremely unfair that its

admission violates fundamental conceptions of justice."  **Dunnigan v. Keane**, 137 F.3d 117, 125

(2d Cir. 1998) (internal quotations and citations omitted).  To rise to the level of a due process

violation, "the item must have been 'sufficiently material to provide the basis for conviction or to

remove a reasonable doubt that would have existed on the record without it.'"  **Id**. (*quoting*

**Johnson v. Ross**, 955 F.2d 178, 181 (2d Cir. 1992)).  The erroneously admitted evidence is

assessed "in light of the entire record." **Id**. While the 911 call obviously bolstered the jury's assessment of the evidence, it was not "crucial, critical, highly significant" to the conviction. **Id**. (*quoting* **Collins v. Scully**, 755 F.2d 16, 19 (2d Cir. 1985)). The 911 call itself did not identify Sanchez, but instead corroborated the circumstances. Two other witnesses had described the events. The weapon was recovered at the scene. Therefore, the admission of the 911 call, while error under state evidentiary rules, did not violate Sanchez's due process rights. This claim should be **DENIED**.

> ### b.    Sixth Amendment Claim

Sanchez claims that the admission of the 911 call also violated his Sixth Amendment rights, but that claim is procedurally barred because the Appellate Division found the claim unpreserved. A petitioner may be precluded from pursuing his claims on the merits because he procedurally defaulted. *See* **Coleman v. Thompson**, 501 U.S. 722, 750 (1991); **Jones v. Vacco**, 126 F.3d 408, 414 (2d Cir. 1997) (*citing* **Ellman v. Davis**, 42 F.3d 144, 147 (2d Cir. 1994)). This preclusion from federal habeas review results when: (1) the state court declines to address petitioner's federal claim because petitioner failed to meet a state procedural requirement, and (2) the state court decision rested on an independent and adequate state ground. *See* **Coleman**, 501 U.S. at 729-30. The Appellate Division's decision that Sanchez's claim was unpreserved constitutes an independent and adequate state procedural requirement. **Garcia v. Lewis**, 188 F.3d 71, 78-79 (2d Cir. 1999).

The federal district courts cannot hear procedurally barred claims unless a petitioner "can demonstrate cause for the default and actual prejudice . . . or demonstrate that failure to consider

the claims will result in a fundamental miscarriage of justice." **Coleman**, 501 U.S. at 750.  In

order to show "cause," the petitioner must demonstrate that "'some objective factor external to

the defense impeded counsel's efforts' to raise the claim in state court." **McCleskey v. Zant**,

499 U.S. 467, 493 (1991) (*citing* **Murray v. Carrier**, 477 U.S. 478, 488 (1986)).  The

"prejudice" requirement is satisfied by a showing of "actual prejudice resulting from the errors of

which [petitioner] complains." **United States v. Frady**, 456 U.S. 152, 168 (1982).  Failing the

"cause and prejudice" test, a petitioner may claim a "miscarriage of justice" only if he can

supplement his alleged constitutional violation with "a colorable showing of factual innocence"

in the form of newly adduced evidence.  *See* **Washington v. Superintendent, Otisville Corr.**

**Facility**, 1997 WL 178616, at *7 (S.D.N.Y. Apr. 11, 1997) (*quoting* **McCleskey**, 499 U.S. at

494).

      Sanchez has not presented evidence of any external objective factor which prevented him

from preserving this claim for appellate review.  Similarly, Sanchez cannot show prejudice, as

there was sufficient evidence the jury could rely on, even without the 911 call, to convict him.

Finally, Sanchez has raised no new evidence of actual innocence that would demonstrate a

fundamental miscarriage of justice.  Therefore, this claim should be **DENIED**.

      **4.**      **Claim of Prosecutorial Misconduct**

      Sanchez's third claim is that the prosecutor's summation deprived him of his right to a

fair trial and his rights of confrontation under the Sixth Amendment.  "[I]t 'is not enough that the

prosecutors' remarks were undesirable or even universally condemned.' . . . The relevant

question is whether the prosecutors' comments 'so infected the trial with unfairness as to make

the resulting conviction a denial of due process.'" **Darden v. Wainwright**, 477 U.S. 168, 181

(1986) (*quoting* **Darden v. Wainwright**, 699 F.2d 1031, 1036 (11th Cir. 1983), and **Donnelly v.**

**DeChristoforo**, 416 U.S. 637 (1974)).  The standard is not met here.

       While some of the prosecutor's statements, at their worst interpretation, may have been

improper, those interpretations are not clear from the record.  For example, it is not clear the

prosecutor intended a religious reference, or intended to vouch for her witnesses.  The Court

should not infer the most damaging meaning from an ambiguous remark.  **Donnelly**, 416 U.S. at

647.  As the Appellate Division found, the prosecution's summation did not render the trial

fundamentally unfair, particularly because the trial court instructed the jury to disregard some of

her comments in addition to the usual instruction that counsels' arguments are not evidence.  The

Court is to presume that a jury will follow a curative instruction.  **Weeks v. Angelone**, 528 U.S.

225, 234 (2000).  This claim should be **DENIED**.

### IV. CONCLUSION

       Given the foregoing analysis, the Court recommends that Sanchez's petition be

**GRANTED** on the basis of his **Batson** claim.  Pursuant to Rule 72, Federal Rules of Civil

Procedure, the parties shall have ten (10) days after being served with a copy of the

recommended disposition to file written objections to this Report and Recommendation.  Such

objections shall be filed with the Clerk of the Court and served on all adversaries, with extra

copies delivered to the chambers of the Honorable Richard M. Berman, 500 Pearl Street, Room

650, and to the chambers of the undersigned, Room 1970.  Failure to file timely objections shall

constitute a waiver of those objections both in the District Court and on later appeal to the United

States Court of Appeals.  *See* **Thomas v. Arn**, 474 U.S. 140, 150 (1985); **Small v. Sec'y of**

**Health and Human Servs.**, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1)

(West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(e).

**DATED: April 10, 2007**
**New York, New York**

**Respectfully Submitted,**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

**Copies of this Report and Recommendation were sent to:**

Petitioner
Jesus Sanchez, 00-A-3564
Franklin Correctional Facility
62 Bare Hill Road, Box 10
Malone, NY 12953

Counsel for Petitioner
Steven J. Miraglia
Associate Appellate Counsel
The Legal Aid Society
Criminal Appeals Bureau
199 Water St., 5th Floor
New York, NY 10038

Counsel for Respondent
Nancy D. Killian
Assistant District Attorney
Bronx County
198 E. 161st St.
Bronx, NY 10451

23